IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JOHN WILLIAM SCHARNHORST, III                                    PLAINTIFF

v.                         Civil No. 5:22-CV-05167-TLB-CDC

SHERIFF TIM HELDER, Washington County, Arkansas;
MAJOR RANDALL DENZER, Washington County Detention Center;
CORPORAL TOM MULVANEY, Washington County Detention Center;
CAPTAIN YATES; and DEPUTY RICHARD BELL                           DEFENDANTS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND ORDER

Plaintiff John William Scharnhorst, III, filed the above-captioned civil rights action pursuant to 42 U.S.C. § 1983, generally alleging Defendants violated his constitutional rights by refusing to allow him to meet privately with counsel when he was detained at the Washington County Detention Center ("WCDC").[1]  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3), the Honorable Timothy L. Brooks, United States District Judge, referred this case to the

---

[1] This is one of seven civil rights actions Plaintiff has initiated in this District related to the conditions of his pretrial confinement at the Washington County Detention Center ("WCDC"). *See Scharnhorst v. Cantrell et al.*, 5:22-CV-05138-TLB (W.D. Ark. July 15, 2022); *Scharnhorst v. Cantrell, et al.*, 5:22-CV-05176-TLB-CDC (W.D. Ark. Aug. 30, 2022); *Scharnhorst v. Cantrell, et al.*, 5:22-CV-05218-TLB-CDC (W.D. Ark. Oct. 19, 2022); *Scharnhorst v. Cantrell et al.*, 5:22-CV-05232-TLB-CDC (W.D. Ark. Nov. 28, 2022); *Scharnhorst v. Cantrell et al.*, 5:22-CV-05238-TLB-CDC (W.D. Ark. Dec. 14, 2022); *Scharnhorst v. Ake et al.*, 5:22-CV-05243-TLB-CDC (W.D. Ark. Dec. 19, 2022).   On this Court's recommendation, Judge Brooks granted Defendants' Motion for Summary Judgment and dismissed *Scharnhorst v. Cantrell, et al.*, Case No. 5:22-CV-05176 (W.D. Ark. Aug. 30, 2022), with prejudice. *See* Case No. 5:22-CV-05176 (ECF No. 74). All other cases remain pending at various stages of litigation.

undersigned for the purpose of making a Report and Recommendation on Defendants' Motion for Summary Judgment. (ECF No. 68).   Plaintiff opposes the Motion, (ECF No. 104), but Defendants did not reply.   For the reasons discussed below, the undersigned recommends that Defendants' Motion for Summary Judgment be **GRANTED**.

There are related pending motions. Plaintiff filed a Motion to Supplement his Amended Complaint, which Defendants oppose.   (ECF Nos. 98, 99).   Plaintiff also filed a Motion for Subpoena, (ECF No. 100), and a Motion to Supplement his response to the Motion for Summary Judgment, (ECF No. 107).   Defendants have responded to Plaintiff's Motion for Subpoena, (ECF No. 101), and oppose Plaintiff's Motion to further supplement his response to the pending Motion for Summary Judgment.   (ECF No. 107).   These motions are ripe for the Court's consideration, and for the reasons detailed below, each of the motions, (ECF Nos. 98, 100, 106), is **DENIED**.

## I.     PROCEDURAL POSTURE

On August 10, 2022,[2] Plaintiff filed his original complaint and *in forma pauperis* ("IFP") application.   (ECF Nos. 1-2).   This Court granted Plaintiff's request to proceed IFP.   (ECF No. 3).   Plaintiff's original complaint identified representatives of the Washington County public defender's office as defendants.   (ECF No. 1).   During preserve review of the complaint pursuant to 28 U.S.C. § 1915A(a), the undersigned recommended that claims against those public defender defendants be dismissed for failure to state a claim.   (ECF No. 6).   The Court ordered service of the original complaint on remaining Defendants Tim Helder, Randall Denzer, and Tom Mulvaney.[3]   (ECF No. 7).

---

[2] This Court does not endeavor to describe every docket entry in this case, only the background relevant to the Court's analysis of the pending motions.

[3] To identify the John Doe Deputies named as defendants, the Court's service order also directed

On September 28, 2022, Judge Brooks overruled Plaintiff's objections (ECF N0. 12), adopted the recommendation and dismissed the public defender defendants, Denny Hyslip, and the John Doe Public Defenders #1 and #2. (ECF No. 16).

On September 29, 2022, Defendants Helder, Denzer, and Mulvaney responded to Plaintiff's original complaint by filing a Motion to Dismiss along with their Answer. (ECF Nos. 17-19).   The undersigned directed Plaintiff to respond to Defendant's Motion to Dismiss, and granted Plaintiff leave to file an amended complaint.   (ECF No. 20).   Plaintiff filed an Amended Complaint, identifying the following defendants: Sheriff Tim Helder, Major Randall Denzer, Denny Hyslip, Corporal Tom Mulvaney, John Doe Sheriff's Deputy #1, John Doe Sheriff's Deputy #2, John Doe Sheriff's Deputy #3, John Doe Sheriff's Deputy #4, John Doe Sheriff's Deputy #5, John Doe Public Defender #1, John Doe Public Defender #2, John Doe Public Defender #3, and Captain Yates.   (ECF No. 28).

Plaintiff's Amended Complaint sets forth six claims for relief:   (1) On November 19, 2021, December 14, 2021, and from December 15, 2021, to April 15, 2022, Defendants conspired to deprive him of due process, his right to counsel, and access to the courts; (2) on November 19, 2021, John Doe Deputy #1 and John Doe Deputy #2 ordered him to meet with counsel in the presence of others; (3) on December 3, 2021, John Doe Public Defender #1 conspired with the prosecutor to continue his court date from December 3, 2021, to December 15, 2021, without his consent; (4) on December 14, 2021, John Doe Deputy #3, John Doe Deputy #4, John Doe Deputy #5, and John Doe Public Defender #2, ordered him to meet with the public defender representative

---

Defendant Helder to "advise the Court of the names of the sheriff's deputies who allegedly refused to allow Plaintiff to meet with the public defender representatives privately on December 14, 2021." *Id*.

in the presence of others; (5) on December 15, 2021, state trial court Judge Jones discharged the public defender's office based on the representation of John Doe Public Defender #3 that he had refused to cooperate with the public defender at the December 14, 2021 meeting, leaving him without counsel from December 15, 2021, to April 15, 2022; and (6) from December 15, 2021, to April 15, 2022, Defendant Mulvaney denied Plaintiff's multiple requests for a private meeting with counsel. (ECF No. 28)

On October 28, 2022, Defendants Helder, Denzer, and Mulvaney answered the Amended Complaint, and the outstanding Motion to Dismiss was denied as moot.  (ECF Nos. 32, 34). Consistent with its prior recommendation, the undersigned recommended that Plaintiff's Amended Complaint against the public defender defendants be stricken, and these public defender defendants terminated from this action.   (ECF No. 34).   The Court ordered Defendant Helder to provide the names of the unidentified John Doe deputies identified as defendants to the Amended Complaint.   *Id.*

Plaintiff filed self-styled "objections" to Defendants' Answer on November 14, 2022. (ECF No. 35).

On November 17, 2022, Defendants responded to the Court's order directing them to identify the John Doe Deputy defendants, explaining, in pertinent part:

> To the best information and belief of detention center personnel, jail personnel who were present during video meetings or arraignments on November 19, 2021, include Sgt. Sarah Sears, Tyler Ricker, Justin Edens, Clinton McCarver, Bradley Haynes, and part-time officer Edward Boyd. . .. To the best information and belief of detention center personnel, jail personnel who were present during video meetings or proceedings on December 14, 2021, include Justin Edens, Scott Sharp, and Richard Bell.

(ECF No. 38).

On December 12, 2022, the undersigned directed Plaintiff to identify which of the named deputies were involved in the alleged violations of his constitutional rights.   (ECF No. 41). After an unopposed extension of time to respond, (ECF Nos. 46-49), Plaintiff was ordered to identify the John Doe Sheriff's deputy defendants by March 20, 2023.   (ECF No. 49).

In response to the Court's Order, (ECF No. 50), Defendants Helder, Denzer, and Mulvaney filed a notice on March 2, 2023, advising the Court and Plaintiff that they did not intend to file a motion for summary judgment on the issue of exhaustion.   (ECF No. 52).

On March 15, 2023, Plaintiff filed a Notice identifying "Deputy Richard Bell as the Deputy who insisted that [he] conduct a meeting with the public defender in his presence, the presence of other deputies, and the presence of fellow detainees, in a room monitored by closed circuit camera and listening devices, and refused to allow [him] to meet with the public defender in private when [he] attempted to assert my rights by requesting privacy."   (ECF No. 54).   Given this response, this Court ordered service on Deputy Bell and directed the Clerk to amend the case caption to replace John Doe Deputy #1 with Deputy Bell.   (ECF No. 55).   Defendant Bell answered the Amended Complaint on April 4, 2023.   (ECF No. 63).[4]

On March 17, 2023, an initial scheduling order was entered which addressed discovery and directed any motion for summary judgment to be filed by August 17, 2023.   (ECF No. 57). Defendants requested (and received) an extension of time to file a motion for summary judgment, (ECF Nos. 66-67), which was later filed on October 18, 2023.   (ECF Nos. 68-70).   The undersigned provided instructions to and a filing deadline for Plaintiff's response to the Motion.

---

[4] On December 9, 2022, this Court ordered that Defendant Yates be served with the Amended Complaint.   (ECF No. 39).   On January 11, 2023, Defendant Yates filed an Answer to the Amended Complaint.   (ECF No. 43).

(ECF No. 71).

On November 6, 2023, Plaintiff filed his first request for an extension of time to respond to the Motion for Summary Judgment.   (ECF No. 73).   That same day, Plaintiff filed a Motion for Contempt, alleging Defendants failed to timely disclose security footage from December 14, 2021.   (ECF No. 74).   On November 21, 2023, Defendants responded, denying they violated any court order.   (ECF Nos. 80-81).

While Plaintiff's first Motion for Contempt was pending, he filed two more requests for extension of time to respond to Defendants' Motion for Summary Judgment, citing problems obtaining meaningful access to the prison law library.   (ECF No. 82, 96).   The Court granted both requests.   In response to Plaintiff's second motion for an extension of time and on February 6, 2024, this Court enlarged the time and directed Plaintiff to respond by March 22, 2024.   (ECF No. 97).

On February 7, 2024, Plaintiff filed a Motion to Supplement the (Amended) Complaint, requesting to add Scott Sharp and Justin Edens as defendants to this action.   (ECF No. 98). Defendants opposed the Motion, arguing amendment would be untimely pursuant to the Court's initial scheduling order and that Plaintiff failed to identify good cause to modify the scheduling order to allow for his amendment.   (ECF No. 99).

On February 23, 2024, Plaintiff filed a Motion for Subpoena, requesting the transcript of his December 15, 2021, state court arraignment.   (ECF No. 100).   Defendants responded that they too had requested this transcript, but the court reporter advised she was "unable to find the recording of Mr. Scharnhorst's arraignment on December 15, 2021, before Judge Casey Jones." (ECF No. 101).   Defendants do not object to issuance of a subpoena to obtaining this transcript

6

despite receiving information that the transcript does not exist.   *Id.*

On March 11, 2024, the undersigned recommended that Plaintiff's Motion for Contempt be denied.  (ECF No. 103).   No objections were filed and on March 29, 2024, Judge Brooks adopted the recommendation and denied Plaintiff's Motion for Contempt.   (ECF No. 105).

On March 22, 2024, Plaintiff responded to Defendants' Motion for Summary Judgment. (ECF No. 104).   Thereafter, on April 10, 2024, Plaintiff filed a Motion to Supplement the Summary Judgment record.  (ECF No. 106).   On April 19, 2024, Defendants filed their reply. (ECF No. 107).   The undersigned turns to its consideration of the Motion for Summary Judgment.

## II.    MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standard

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party."   *Ward v. Olson*, 939 F. Supp. 2d 956, 961 (D. Minn. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).   A fact is material only when its resolution would affect the outcome of a case.   *Anderson*, 477 U.S. at 248.

Further, the moving party bears the initial burden of identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2001).   In response, the nonmoving party "may not rest upon mere denials or allegations but must instead set forth specific facts sufficient to raise a genuine issue for trial."   *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002). In considering a summary judgment motion, the court views all the evidence and inferences in the

light most favorable to the nonmoving party.   *Anderson*, 477 U.S. at 255.

### B. Facts[5]

On November 18, 2021, Plaintiff was booked into the Washington County Detention

Center ("WCDC") on several state criminal charges.   (ECF No. 70-2, p. 1).   On November 19,

2021, Plaintiff appeared for court for his first appearance on those charges pursuant to Rule 8.1 of

the Arkansas Rules of Criminal Procedure.   (ECF No. 70-13, pp. 1-2).   The hearing was

conducted via ZOOM.[6]   *Id.*

Plaintiff describes that on the day of this hearing, he and "approximately fifteen other

detainees were directed to stand in line in front of a tablet, as if waiting in a grocery store line, and

then meet with Lee Warden, the public defender and discuss [their] legal affairs in the presence of

approximately six sheriff's deputies and all of the other detainees as if discussing the weather with

the cashier in the grocery store.   While discussing [his] case with Lee Warden, he became aware

of the fact that Sheriff Tim Helder was the alleged victim in [his] case and he said 'stop talking

---

[5] In response to Defendants' Motion for Summary Judgment, Plaintiff filed a "Response to the Motion for Summary Judgment," (ECF No. 104, pp. 1-7); "Statement of Disputed Material Facts," *id.* at pp. 8-15; along with an Exhibit in support, *id.*, pp. 1-36.   Neither the Response nor the Statement of Disputed Material Facts is notarized or sworn under penalty of perjury.   *See* (ECF No. 104).   Plaintiff's Exhibit consists of specific grievances or requests Plaintiff submitted while detained at the WCDC, along with a page from his WCDC mail history.   (ECF No. 104, pp. 16-36).   This Court, therefore, considers Plaintiff's verified Amended Complaint and this Exhibit in determining whether there are any material fact disputes that precludes summary judgment in this matter. *See Ward v. Moore*, 414 F.3d 968, 970 (8th Cir. 2005) (the Amended Complaint "is the equivalent of an affidavit and can serve as [his] response to the defendants' summary judgment motion.") (citing Fed. R. Civ. P. 56(e)).

[6] Although it is evident from the summary judgment record that Plaintiff did not appear in the same room as the public defender representative for this hearing, it is unclear whether the state trial court judge, prosecuting attorney, and public defender representative appeared from the same location or if each party was appeared from a separate location via zoom.   For the purposes of Defendants' Motion for Summary Judgment, however, this fact is not material to the Court's analysis.

right now, there are deputies all around you.'" (ECF No. 28).   Although Plaintiff does not specify

whether this happened before, during, or after the hearing itself, according to Defendant Bell, "[f]or

Rule 8.1 hearings, it was customary for the detainees to meet with a Public Defender or Clerk

before the court appearance so that they were informed of their rights, what they are being detained

for, and to get information to argue for a bond to the Court.   This is generally done via ZOOM

and the detainee will appear before the judge via ZOOM."   (ECF No. 70-9, p. 3).

During the hearing, Washington County District Judge Stephenson identified Plaintiff,

informed him of the charges against him, and determined there was probable cause to detain him

on those charges. (ECF No. 70-13, p. 3).   Judge Stephenson declined to reduce his bond,

appointed the public defender representative to represent him at the hearing, and scheduled his

first appearance for December 3, 2021, at 7:45 am at the WCDC.   *Id.*

Plaintiff did not appear for court on December 3, 2021.   (ECF No. 28).   Instead,

Plaintiff's next court hearing was on December 15, 2021.   *See* Order, *Scharnhorst v. State*, Case

No. 72CR-21-1768 (Washington Cnty. Cir. Ct. Jan. 12, 2022).[7]   On December 14, 2021, the day

prior to his court appearance, Plaintiff says that he "was ordered into a zoom meeting with the

public defender by the deputies in their presence and the presence of other detainees.   The other

detainees conducted their meetings in front of the deputies, [himself], and the other detainees.

When it was [his] turn, recalling Lee Warden's advice from 11/19/21, [he] refused to discuss

---

[7] This Court takes judicial notice of Plaintiff's state court criminal proceedings.   Fed. R. Evid.
201(b)(2) (providing that the court may judicially notice a fact that is "not subject to reasonable
dispute because it: (2) can be accurately and readily determined from sources whose accuracy
cannot reasonably be questioned").   Arkansas state court records are publicly accessible: at
https://caseinfo.arcourts.gov/opad.   *See Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir.
2005) ("[W]e may take judicial notice of judicial opinions and public records.").

anything except [his] objection to the situation and [his] reasons." (ECF No. 28, p. 11).

At this point, recollections of events differ.   Plaintiff says "the deputies became adamant and even aggressive, insisting that [he] co-operate. They conferred with the lady from the public defender's office and then she too became adamant that [he] co-operate and conduct [his] meeting with her in the presence of the deputies and other detainees."   *Id.*   Plaintiff claims Defendant Bell "told [him] he didn't have a right to a private meeting and that [he] had to talk to the public defender in front of him and other deputies."   (ECF No. 104, p. 14).

To the contrary, Defendant Bell says he "did not refuse to allow [Plaintiff] to meet with his attorney, [Plaintiff] refused to speak to the attorney because deputies and other detainees were present." (ECF No. 70-9, p. 3).   According to Defendant Bell, "[t]he only time [he] spoke to [Plaintiff] was when he was present for the public defender's office to go over an Affidavit of Indigency and Arraignment Proceedings Form.   No physical force was used."   *Id.*

During Plaintiff's arraignment on December 15, 2021, Plaintiff says "a lady from the public defender's office whose name [he] do[es] not know told the judge that [he] refused to co-operate with the public defender on December 14th and Judge Jones refused [his] request to continue to be represented by the public defender."   (ECF No. 28, p. 12).   Although not explicit, it appears this hearing was also conducted via ZOOM.[8]   *Id.*   According to Plaintiff, "on or about March 15, 2022, [state trial court] Judge Joanna Taylor agreed that [he] should have been afforded a private meeting with the public defender on December 14, 2021, stating 'you certainly have the right to

---

[8] At the December 15, 2021, hearing, it appears that the public defender representative did not appear at the same location as the detainees scheduled for court, including Plaintiff.   It is not clear, however, whether the public defender representative appeared from the same location as the Judge or prosecuting attorney.   Again, this fact is not relevant to the Court's analysis.   It appears there is no transcript from these proceedings.   *See* (ECF No. 101).

attorney-client privilege,' and ordered that [he] meet with the public defender free of anyone else, in private and begin the process of re-establishing the public defender as [his] legal counsel." (ECF No. 28, p. 12).   Plaintiff met privately with counsel on April 15, 2022.   Plaintiff contends "the acts of depriving [him] of a private meeting and then telling Judge Jones that [he] was unco-operative caused [him] 4 months of deprivation of legal counsel." *Id.*

Defendants say that WCDC started facilitating these remote court hearings during the start of the COVID-19 pandemic when "many courts stopped or limited in person appearances."   (ECF No. 70-10, p. 2).   According to Defendant Yates, during the COVID-19 pandemic, WCDC officials also "attempted to eliminate in person visiting in the Washington County Detention Center.   To accommodate attorneys and the courts, the booking officers and the transport division worked with the courts and attorneys to schedule in person visits on a limited basis, and other scheduled virtual visits or court appearances." (ECF No. 70-10, p. 2).

Defendants say there are two types of attorney/detainee meetings: "[S]cheduled meetings and routine meetings." (ECF No. 70-8, p. 1).   "[The] [s]cheduled meetings are requested by the attorney.   The routine meetings revolve around the court schedule." *Id.*   Defendants describe three (3) ways an attorney can meet with their detained client:   First, the attorney can schedule a meeting through booking where the attorney can physically meet an inmate in a "bonding room" or "interview room." *Id.*   A deputy is not present during these meetings and the room is not recorded. *Id.*, pp. 1-2.   Second, an attorney can schedule to meet with a detained client via ZOOM. *Id.*, p. 2.   The attorney appears virtually for these meetings and provides the detainee a "personal meeting id ('PMI')" that the detainee uses to log into an iPad. *Id.*   The PMI prevents the detainee from accessing prohibited content. *Id.*   These meetings also take place in the

"bonding room," the meetings are not recorded, and while a deputy is not physically present, the deputy can see into the room to check on the detainee.   *Id.*   Third, an attorney could schedule to meet with an inmate via zoom in a non-private setting.   In these situations, the attorney similarly provides a PMI so that the detained client can log into an iPad.   *Id.*   These meetings are scheduled through the transport division and the attorney "is aware other people (detainees and/or deputies) are present because they are visible on the screen."   *Id.*   These meetings take place "in the housing unit, hallway, multipurpose room in the pod, recreational yard or other area, and is subject to others being present."   *Id.*   Deputies are always present for these meetings because "[g]iving detainees' access to this iPad without a deputy present creates a risk of fighting over the iPad (causing injury to detainees or damage to the iPad) or unauthorized access to internet content."   *Id.*   The third "method is mostly used by attorneys who need to meet with several detainees on the same day."   *Id.*

Understandably, "[i]t is [] common for a detainee to speak with an attorney and/or legal support staff during or prior to Rule 4.1 or Rule 8.1 hearings or arraignment proceedings.   The paperwork for each detainee may be presented to, reviewed with, and or explained to the detainee by the attorney and/or legal support staff prior to the detainee going to court.   A deputy is always present during these meetings and may physically provide the detainee with a hard copy of the paperwork sent over by the attorney or support staff at issue."   *Id.*, p. 3.   Evidently, "[w]hen a deputy is present during these meetings/hearings, they routinely point out the location a detainee needs to sign or initial."   *Id.*   But deputies are not authorized "and specifically instructed that they are not to give legal advice . . .." *Id.*

Plaintiff contends these deputies' involvement during attorney meetings/hearings is more

robust, contending that deputies "act as [an] interpreter . . . and regularly give legal advice." (ECF No. 104, p. 14).   Plaintiff specifically disputes Defendants' contention that the WCDC allows attorneys to schedule private client meetings with inmates in the bonding room.   *Id.*   Plaintiff says that he was never allowed a private, confidential attorney meeting until Circuit Court Judge Taylor ordered one.   *Id.*

In considering this claim, the Court takes judicial notice of Plaintiff's state trial court record.   *See* Fed. R. Evid. 201.   Court records reflect that Plaintiff was arraigned on December 15, 2021.   *See* Order of Arraignment Proceedings, *State v. Scharnhorst*, Case No. 72CR-21-1768 (Wash. Cir. Ct. Jan. 12, 2022).   An order entered following those proceedings does not specify whether the presiding judge found Plaintiff indigent and therefore eligible for a public defender. *Id.*   From January 22, 2022, to February 9, 2022, Plaintiff submitted several filings "pro se." *See generally Scharnhorst*, Case No. 72CR-21-1768.

On February 10, 2022, attorney Steven Kay filed an entry of appearance. *See* Entry of Appearance, *Scharnhorst*, Case No. 72CR-21-1768 (Wash. Cir. Ct. Feb. 10, 2022).   Eight (8) days later, Kay filed a Motion to Withdraw as counsel, and on February 22, 2022, Judge Taylor granted Kay's Motion to Withdraw.   *Id.*   Following that Order, Plaintiff submitted several additional "pro se filings."   *Id.*   On March 3, 2022, Judge Taylor ordered a representative from the Washington County Public Defender's Office to meet privately with Plaintiff.   *Id.*   Thereafter, on April 5, 2022, Judge Taylor ordered that one of Plaintiff's pro se filings be stricken from the record on the grounds that "he has been found indigent, and the Court has appointed the Public Defender's office to represent [him]."   *See* Order Striking Pretrial *Pro Se* Motion, *Scharnhorst*, Case No. 72CR-21-1768 (Wash. Cir. Ct. Apr. 5, 2022).   Plaintiff ultimately pleaded guilty to his state criminal

charges and was sentenced to a six (6) year term of imprisonment at the Arkansas Division of Correction ("ADC").   *See* Plea Questionnaire, *Scharnhorst*, Case No. 72CR-21-1768 (Wash. Cir. Ct. Jan. 17, 2023).   Plaintiff is currently serving that term of imprisonment at the Barbara Ester Unit, ADC, in Pine Bluff, Arkansas.

### C.   Analysis

Defendants' Motion for Summary Judgment asserts two bases for relief: (1) With respect to Defendant Bell, they contend Plaintiff failed to first exhaust his administrative remedies in accordance with 42 U.S.C. § 1997e(a); and (2) as to all Defendants, they seek summary judgment as a matter of law on the merits of Plaintiff's claims. (ECF No. 68).

### 1.   Exhaustion Requirement Under 42 U.S.C. § 1997e(a)

Defendants say Plaintiff's claims against Defendant Bell should be dismissed because Plaintiff failed to first exhaust his administrative remedies against Bell in accordance with 42 U.S.C. § 1997e(a) before initiating this lawsuit.[9]   (ECF No. 68).   Plaintiff responds that he did not learn of Defendant Bell's name until after the lawsuit was filed, and thus, could not have identified him by name in his grievances.   (ECF No. 104).   On this argument, the undersigned agrees with Defendants.

Plaintiff was a prisoner when he initiated this action.   (ECF No. 28).   Thus, his claims are subject to the Prison Litigation Reform Act (PLRA).   Section 1997e(a) of the PLRA "requires a

---

[9] Defendant Bell had not yet been identified as one of the "John Doe" defendants and thus he had not entered his appearance when this Court ordered the named Defendants to either file a motion for summary judgment on the issue of exhaustion or to submit a notice informing the parties that they did not intend to pursue such a defense at trial.   (ECF No. 50).   Accordingly, Defendant Bell's request for summary judgment on the grounds that Plaintiff did not first exhaust his administrative remedies in accordance with 42 U.S.C. § 1997e(a) is properly before this Court.

prisoner to exhaust 'such administrative remedies as are available' before suing over prison conditions." *Booth v. Churner*, 532 U.S. 731, 733 (2001).   Proper exhaustion under Section 1997e(a) "demands compliance with the agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).   "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, not the PLRA, that define the boundaries of proper exhaustion."   *Jones v. Bock*, 549 U.S. 199, 218 (2007).

### i.   WCDC Grievance Procedure

The Washington County Detention Center Handbook ("WCDC Handbook") describes the grievance procedure as follows:

> You are allowed to file a grievance if you feel you have been subjected to abuse or an abridgement of your civil rights while being detained.   All grievances will be done on the kiosk in your cellblock.
> A grievance must be submitted within ten days from the time the event complained of occurred.   The grievance should include:
>
> A.   The date and approximate time of the event
> B.   The name(s) of the person(s) involved
> C.   The name(s) of any witness(es)
> D.   Pertinent details of the event
>
> All grievances are reviewed by the Jail Administrator or their designee.   If you feel your grievance was improperly handled, you may appeal to the Sergeant or Lieutenant.

(ECF No. 70-7, pp. 2-3).[10]

---

[10] Notably, in *Scharnhorst v. Cantrell, et al.*, Case No. 5:22-CV-05218-TLB-CDC, Defendants describe two grievance procedures—the procedure outlined in the WCDC Handbook: Rules and Regulations for Detainees and the one contained in the WCDC Policy and Procedures Manual. *See Scharnhorst*, 22-CV-05128 (ECF Nos. 38-4, 38-5).   The primary difference between the two is *when* the inmate is required to submit his grievance—the WCDC Handbook: Rules and

There is no dispute that Plaintiff filed grievances alleging WCDC officials violated his constitutional rights by refusing to allow him to meet privately with the public defender representative.   (ECF No. 70-3).   For example, on December 15, 2021, Plaintiff submitted grievance number 26205334:

> My rights and the rights of other detainees are being violated in the manner in which Tim Helder is handling video conferencing with legal counsel.  I sat in the multipurpose room yesterday and heard Brian Michael Murray's conversation with his attorney, facts about his case, discussion regarding his actions, the strategy he and his lawyer intend to take in court, etc. I also overheard person and medical financial information of other detainees while being interested by the public defender's office.  Three Sheriff's deputies were present and also looking on as suspected criminals discussed their cases with their legal counsel.  I refused to discuss my case in the presence of Tim Helder's deputies and was refused a private meeting with the public defender.  Tim Helder is my accuser, an accomplice to the kidnapping of my children, a conspirator in the efforts to obstruct my campaign for Sheriff and about to be the defendant in my Federal civil law suit, I will not discuss anything with the public defender or any lawyer in front of his deputies, I demand to have the privacy to meet with legal counsel as prescribed by law.

(ECF No. 70-3, p. 1).

---

Regulations for Detainees requires inmates to submit grievances within "eight hours from the time the event complained of occurred," *id.* (ECF No. 38-5), whereas the WCDC Policy and Procedures Manual says that grievances "must be made within 10 days of the alleged incident . . . [and] [g]rievances filed more than 30 days following the alleged incident will not be considered," *id.* (ECF No. 38-4).  It is unclear to this Court why Defendants' summary judgment record includes what appears to be a third grievance procedure considering that the factual predicate of Plaintiff's claims in this case and in *Scharnhorst*, 5:22-CV-05218, involve the same general time period. That said, this Court does not consider the record in *Scharnhorst*, 5:22-CV-05218, because it is not a part of the summary judgment record in this case.  Further, and more to the point, in this case, Plaintiff does not challenge the Defendants' description of what the WCDC grievance procedure requires. *See* (ECF No. 104).  Accordingly, this Court considers Defendants' description of the WCDC grievance procedure as undisputed for the purposes of their Motion for Summary Judgment.  *See* Fed. R. Civ. P. 56(e)(2).

Five days later (December 20, 2021), Plaintiff submitted grievance number 26257736, which provides, in pertinent part:

> . . . Detainees are not being provided with a means for conducting private meetings with legal counsel, I've had sheriff's deputies standing over my shoulder during both meetings I've had with the public defender and have been present during other detainees meetings and been apartied [sic] to information which violates the rights of privacy of those individuals and had the reverse situation whereas other detainees are now aware of details of my legal case which they should not be. . . .

(ECF No. 70-3, p. 5).

Defendants' exhaustion argument, however, is not that Plaintiff failed to submit the grievance within the required timeframe (ten days) or that the grievances themselves are lacking because they do not include the "date and approximate time of the event," "the names of any witnesses," or the "pertinent details of the event." (ECF No. 69).   Rather, Defendants' exhaustion argument centers on the requirement that a grievance include the "names of persons involved." *Id.*   Specifically, Defendants say Plaintiff failed to satisfy WCDC's grievance procedure because Plaintiff did not identify Defendant Bell by name in these grievances, even though Plaintiff was aware of Bell's name by at least December 19, 2022.   (ECF No. 69, pp. 7-8).

None of Plaintiff's grievances (or requests) alleging that WCDC officials violated his constitutional rights by refusing his request to meet privately with counsel specifically identify Defendant Bell as one of those WCDC officials.   This fact is undisputed.[11]   It is thus inescapable

---

[11] In support of their Motion for Summary Judgment, Defendants submitted "only those grievances and requests related to Plaintiff's court appearances and meetings with attorneys between November 18, 2021, and December 15, 2021." (ECF No. 69, p. 6).   For his part, Plaintiff also submitted specific grievances and requests for this Court to consider. *See* (ECF No. 104). Accordingly, this Court considers Plaintiff's kiosk submissions offered by both the Defendants *and* Plaintiff as the closed universe of kiosk submissions the parties wish for this Court to consider

that Plaintiff failed to follow WCDC grievance procedure when he failed to identify Defendant Bell in any of his grievances.

### ii. Exception to the Exhaustion Requirement

This conclusion, however, does not end the undersigned's analysis.   As the Supreme Court explained, "the PLRA contains 'its own, textual exception'" to the exhaustion requirement. *Smith v. Andrews*, 75 F.4th 805, 808 (8th Cir. 2023) (quoting *Woodford v. Ngo*, 548 U.S. 81, 85 (2006)). "[A]n inmate is required to exhaust those, but only those grievance procedures that are available, i.e., capable of use to obtain some relief for the action complained of."   *Id.* (cleaned up).   "As relevant here [there are] three kinds of circumstances in which an administrative remedy may be unavailable."   *Id.* (internal citation omitted).   "Those situations are (1) when the procedure operates as a simple dead end; (2) when the administrative scheme is 'so opaque that it becomes, practically speaking, incapable of use;' and (3) when prison administrators deliberately thwart prisoner attempts to use the process."   *Id.* (internal citations omitted).

Plaintiff has not specifically identified any exception to the exhaustion requirement; as the Court understands it, Plaintiff says he should be excused from the requirement to identify Defendant Bell by name in his grievances because he was not aware of Bell's name until December 2022, a date after initiation of this lawsuit.   (ECF No. 104).

Analyzing Plaintiff's argument under the governing law, the undersigned is unpersuaded. First, there are no facts suggesting WCDC's grievance procedure is a dead end.   To the contrary, the record reflects a back-and-forth between Plaintiff and Defendant Mulvaney where, for example, Plaintiff submits a grievance on December 15, 2021, "demand[ing] to have the privacy

---

in addressing Defendants' Motion for Summary Judgment.

to meet with legal counsel as prescribed by law," (ECF No. 70-3, p. 1), and Defendant Mulvaney

responds that same day, explaining, the WCDC's position on his request:

> . . . You not speaking with counsel with deputies present is between
> yourself and the courts. We will not leave you alone to do this for
> the safety and security of the facility so long as we are doing
> proceedings like these.   If you [sic] attorney wishes to have a
> private meeting with you then we will accommodate him or her at
> that time, but not during these appearances here in this setting. . ..

(ECF No. 70-3, p. 2).

Second, there is no material fact dispute as to whether WCDC's grievance procedure was

"incapable of use." To the extent Plaintiff may claim he was "incapable" of identifying Defendant

Bell by name because he was not aware of his name until months later, Plaintiff asserts no facts

suggesting he could not obtain Defendant Bell's name within the 10 days allotted to file a

grievance.   Plaintiff does not claim (and there are no facts in the record to suggest), for example,

that Plaintiff requested Defendant Bell's name and Defendant Bell (or any other WCDC official)

refused to provide it.   *Cf. Tope v. Fabian*, Case No. 09-cv-0734 (DWF/RLE), 2010 WL 3307351

at * 11 (D. Minn. July 29, 2010) (citing *Brown v. Sikes*, 212 F.3d 1205, 1207-08 (11th Cir. 2000)

("A grievance procedure that requires a prisoner to provide information [such as the name of an

aggressor] he does not have **and cannot reasonably obtain** is not a remedy that is 'available' to

the prisoner") (emphasis in the original))), *report and recommendation adopted by* 2010 WL

3307354 (D. Minn. Aug. 19, 2010).   The record before the undersigned is distinguishable from

situations where a plaintiff was unable to file a timely grievance "due to some physical and mental

incapacity." *Smith*, 75 F.4th at 809 (citing *Rucker v. Giffen*, 997 F.3d 88, 94 (2d Cir. 2021)

(concluding that "grievance procedures were 'incapable of use'" because plaintiff was hospitalized

during the period he was required to submit a grievance)).   Further, Plaintiff does not assert that

he was unaware – and incapable of knowing – the relevant WCDC grievance procedures.  *Cf. id.*

(citing *Ross v. Blake*, 578 U.S. 632, 648 (2016) (in determining whether plaintiff exhausted

administrative remedies, it is relevant for the court to consider whether the grievance procedures

were "knowable by an ordinary prisoner in [plaintiff's] situation")).

And finally, there is no evidence in the record that WCDC officials "deliberately

thwart[ed]" Plaintiff's attempts to use the grievance procedure.  Plaintiff does not provide any

facts which establish that Defendant Bell refused to wear a name tag or refused to identify himself

upon request or that WCDC officials refused to identify him.  Indeed, Plaintiff provides no

explanation for why he did not learn Defendant Bell's identity until December 2022, months after

he initiated this lawsuit.

### iii.  Exhaustion Conclusion

Accordingly, it is undisputed that Plaintiff failed to follow WCDC grievance procedures

by failing to identify Defendant Bell by name in his grievances.  Because there is no basis to

conclude that these grievance procedures were "unavailable" to Plaintiff at the time of the events

giving rise to his grievance, the undersigned recommends a finding that Plaintiff failed to exhaust

his administrative remedies with respect to Defendant Bell.   Plaintiff's claims against Defendant

Bell should be dismissed without prejudice on that basis.  *See Porter v. Sturm*, 781 F.3d 448, 452

(8th Cir. 2015) (dismissal without prejudice mandatory where plaintiff did not exhaust his

administrative remedies in accordance with 42 U.S.C. § 1997e(a)).

### 2.  Summary Judgment on the Merits

Defendants seek summary judgment on the merits of each of Plaintiff's remaining claims.

To recap, following dismissal of the public defender claims (claims 3 and 5), the following claims

from Plaintiff's Amended Complaint survive:

> (1) on November 19, 2021, December 14, 2021, and from December 15, 2021, to April 15, 2022, the defendants conspired to deprive him of due process, his right to counsel, and access to the courts;

> (2) on November 19, 2021, John Doe Deputy #1 and John Doe Deputy #2 ordered him to meet with counsel in the presence of others;

> (4) on December 14, 2021, John Doe Deputy #3, John Doe Deputy #4, John Doe Deputy #5, and John Doe Public Defender #2, ordered him to meet with the public defender representative in the presence of others; and

> (6) from December 15, 2021, to April 15, 2022, Defendant Mulvaney denied Plaintiff's multiple requests for a private meeting with counsel.   (ECF No. 28).

### i.   42 U.S.C. § 1983

To establish a claim under 42 U.S.C. § 1983, "a plaintiff must allege a violation of a constitutional right committed by a person acting under color of state law."   *Andrews v. City of West Branch, Iowa*, 454 F.3d 914, 918 (8th Cir. 2006).   "Public servants may be sued under section 1983 in either their official capacity, their individual capacity, or both."   *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999) (citing *Murphy v. Arkansas*, 127 F.3d 750, 754 (8th Cir. 1997)).   Here, each defendant is named in his individual and official capacity as an agent of the entity for which he works: Washington County, Arkansas.   (ECF No. 28). The Court turns first to Plaintiff's individual capacity claims.

### a.   Qualified Immunity

Defendants contend they are entitled to qualified immunity on Plaintiff's individual capacity claims.   (ECF No. 68).   In determining whether public officials are entitled to qualified immunity, federal courts conduct a two-part inquiry: "(1) whether the facts, viewed in the light most favorable to [plaintiff], demonstrate the deprivation of a constitutional or statutory right; and

(2) whether the right was clearly established at the time of deprivation." *Ryno v. City of Waynesville*, 58 F.4th 995, 1004 (8th Cir. 2023) (quoting *Jones v. McNeese*, 675 F.3d 1158, 1161 (8th Cir. 2012)).   Courts have "discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Id.* "If [the court] conclude[s] that the alleged facts do not violate a constitutional right, then [the court] need not address the second inquiry, and the defendant[s] will be entitled to qualified immunity." *Id.* (quoting *Groenewold v. Kelley*, 888 F.3d 365, 371 (8th Cir. 2018)).   Here, the Court first considers whether the facts as alleged demonstrate a constitutional violation and find that they do not.

Plaintiff specifically describes two incidents – on November 19, 2021, and December 14, 2021 – where he and several other WCDC detainees were escorted into a room at the WCDC to meet virtually with the public defender representative; Plaintiff says each of those meetings was conducted in a room in the presence of the other detainees and sheriff's deputies.   (ECF No. 28, p. 6).   The record is consistent with Plaintiff's description; Defendants' Exhibit A9 is security footage of the "A-Pod multi-purpose room" from December 14, 2021, (ECF No. 70-5), and while there is no audio, the video is consistent with Plaintiff's description.   Further, Defendant Bell has indicated "the situation [Plaintiff] describes in Count #2 of his Complaint [concerning the November 19, 2021, attorney/detainee meeting] sounds like how [the WCDC] called people out for court." (ECF No. 70-9, p. 3).   The undersigned thus concludes that the way WCDC officials conducted the attorney/detainee meetings on November 19, 2021, and December 14, 2021, is undisputed.

Plaintiff then says from December 15, 2021, to April 15, 2022, he was "refused" a private meeting with counsel.   (ECF No. 28, p. 12).

According to the Washington County Detention Center Handbook, "[detainees] are entitled to visit with [their] attorney.   Reasonable efforts will be made to ensure [they] are brought promptly to the attorney visitation room. . .. If an attorney visits at a time when Officers are busy with other duties, [they] will be taken to the attorney visitation area as soon as an Officer is available.".[12]   (ECF No. 70-7, p. 1).   The policy itself is silent on *how* these private attorney/client meetings are arranged.   But, with respect to inmates represented by the public defender's office, "[r]equests to speak with a public defender must be made in the Legal Services section of the kiosk in [the detainee's] cellblock.   All such requests are reviewed, and a Legal Assistance request is completed and faxed to the public defender's office. . .." *Id.*

The record before the Court shows that – in response to Plaintiff's request to meet privately with counsel – Defendant Mulvaney repeatedly told Plaintiff that his counsel must initiate such a request.   *See, e.g.*, (ECF No. 70-3, pp. 2, 6).   Accordingly, for the purposes of summary judgment, the undersigned finds it undisputed that WCDC detainees cannot request to meet privately with counsel; rather, the detainee's counsel must initiate those requests.

Plaintiff says these practices violate his constitutional rights under the First, Fifth, Sixth, and Fourteenth Amendment Due Process Clause.   (ECF No. 28).   For reasons explained below, the undersigned disagrees.

---

[12] The summary judgment record includes the "Detainee Rights" excerpt from what is entitled "Policies and Procedures." (ECF No. 70-6, p. 1).   According to that excerpt, "[a]ll inmates have a right to have access to their attorney.   Legal consultations shall be permitted in private, unmonitored areas at the place of detention on a reasonable basis." *Id.*   Although it is unclear why there appear to be two policies on detainees' access to counsel, the policies themselves appear to be substantively the same.

### *The First Amendment*

It is undisputed that when Plaintiff met with the public defender representative on November 19, 2021, and started talking to him about his criminal case, the public defender told him to "stop talking. Stop talking right now, there are deputies all around you." (ECF No. 28, p. 7).  It is also undisputed that during a similar attorney meeting on December 14, 2021, Plaintiff refused to speak to the public defender representative because others were present in the same room.[13]  *Id.*, p. 11.  In this context, the undersigned views Plaintiff's First Amendment argument as this:   the presence of others during the attorney meetings on November 19, 2021, and December 14, 2021, chilled his speech in violation of the First Amendment.

### a.  First Amendment Standing

First, "[a] party invoking federal jurisdiction must show a right to assert a claim in federal court by showing injury in fact, causation, and redressability." *Missouri Roundtable for Life v. Carnahan*, 676 F.3d 665, 672 (8th Cir. 2012) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  "Allegations of possible future injury are not sufficient." *Balogh v. Lombardi*, 816 F.3d 536, 541 (8th Cir. 2016) (internal citation omitted).  "A chilling effect on speech protected by the First Amendment can constitute an injury in fact, but allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  *Id.* at 542 (citing *Laird v. Tatum*, 408 U.S. 1 (1972)).

Here, the government conduct at issue is the presence of WCDC personnel during the November 19, 2021, and December 14, 2021, attorney/detainee client meetings.  Viewing the

---

[13] Plaintiff explains that he did not want to talk about his criminal case in the presence of others, specifically Washington County Sheriff's deputies, because Defendant Helder (then-sheriff of Washington County) was one of the alleged victims in that case.  *See* (ECF No. 28, p. 7).

record in the light most favorable to Plaintiff, the Court must conclude the presence of WCDC officials during these meetings was not intended to prohibit or prevent the speech of Plaintiff or anyone else.   To the contrary, the process implemented in response to a pandemic was to accommodate attorney/detainee client meetings given the restrictions on in-person meetings to reduce the spread and incidence of COVID-19 at the WCDC.   *See* (ECF No. 70-8, p. 1).

Plaintiff argues the presence of WCDC officials deterred *his* speech because Defendant Helder (who was then the Sheriff of Washington County), was an alleged victim in his criminal case, and he was campaigning against Defendant Helder for Sheriff.   (ECF No. 28, p. 7).   Trying to understand Plaintiff's fear, it appears Plaintiff believed his intended speech with his counsel would be overheard by the WCDC officials who would communicate Plaintiff's speech to Defendant Helder and/or the prosecuting authority, and Plaintiff's speech would be used against him in his criminal case.   Such potential harm, however, is far too speculative to establish standing.   As the Supreme Court discussed in *Laird*, 408 U.S. 1, plaintiffs do not have standing to pursue their First Amendment claims when the "chilling effect" merely comes from "the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual." *Id.* at 11. Plaintiff's speculative concern that WCDC officials could have used his speech to his attorney against him at some future time is insufficient to establish standing to pursue a First Amendment claim.[14]

---

[14] Notably, there is some suggestion in the record that the purpose of the December 14, 2021, meeting, at least, was for the public defender representative to discuss the "Affidavit of Indigency and Arraignment Proceedings Form" with public defender-eligible detainees.   *See* (ECF No. 70-

Plaintiff contends the presence of WCDC officials during the December 14, 2021, attorney/detainee client meeting caused him injury because the next day, the state court judge relieved the public defender's office of representation and he "did not receive legal counsel for 4 months, until [he] finally met with Michael Roberson on April 15, 2022." (ECF No. 104, p. 6).

As a threshold matter, the Court views Plaintiff's argument is factually incorrect because publicly accessible state court records show Plaintiff was represented by private counsel – albeit for a short time – in February 2022. *See, e.g.*, Entry of Appearance, *Scharnhorst*, Case No. 72CR-21-1768 (Wash. Cir. Ct. Feb. 10, 2022).   In any event, a lack of causation is the prevailing issue. Rule 8.2 of the Arkansas Rules of Criminal Procedure provides that "a *judicial officer shall determine* whether the defendant is indigent and, if so, appoint counsel to represent him or her at the first appearance . . .." Ark. R. Crim. P. 8.2(a) (emphasis added).   To the extent Plaintiff claims that on December 15, 2021, a judicial officer improperly terminated public defender representation of him, that decision (and the reasons for it) is not properly before this Court for review.   It goes without saying that none of the WCDC defendants possessed decision making authority on Plaintiff's appointment of counsel.

For these reasons, Plaintiff has no standing to bring a First Amendment claim against WCDC officials for their presence during the November 19, 2021, and December 14, 2021, attorney/detainee client meetings.

### b.  *Turner* Factors Analysis

Even if Plaintiff has standing to pursue this claim, in determining whether a jail or prison

---

9, p. 3).   Plaintiff, however, asserts no facts—disputed or otherwise—explaining what it was about this form, or the information he was asked to provide with respect to this form, that could have had a detrimental impact on his state criminal case.

policy infringes on the First Amendment rights of inmates, "the relevant inquiry is whether the [policy is] reasonably related to legitimate penological interests."   *Human Rights Defense Center v. Baxter Co. Ark.*, 999 F.3d 1160, 1164 (8th Cir. 2021).   To answer that question, federal courts apply the so-called *Turner* factors: (1) whether the policy has a 'valid rational connection' to a legitimate governmental interest; (2) whether alternative means are open to those desiring to communicate with inmates to exercise the asserted right; (3) what impact an accommodation of the right would have on guards and inmates and prison resources; and (4) whether there are ready alternatives to the policy."   *Id.* (quoting *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003)).   "Courts are to give 'substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Id.* (quoting *Overton*, 539 U.S. at 132).

Here, the *Turner* factors weigh against Plaintiff.

First, the undersigned finds WCDC's practice has a "valid rational connection" to a legitimate governmental interest. According to Sergeant Sarah Sears in WCDC's transport division, "[g]iving detainees' access to [an] iPad without a deputy present creates a risk of fighting over the iPad (causing injury to detainees or damage to the iPad) or unauthorized access to internet content." (ECF No. 70-8, p. 2).   The WCDC practice of refusing to leave the WCDC inmates alone during the November 19, 2021, and December 14, 2021, attorney/detainee meetings is rationally connected to the WCDC's legitimate penological interest in maintaining a safe and secure facility.

Second, Plaintiff possessed alternative means to exercise the asserted right.   Specifically,

Sgt. Sears, who is not a defendant to this action, explains there are at least two (2) other ways for detainees to meet with their attorneys.   (ECF No. 70-8, p. 2).   Specifically, "an attorney can meet with an inmate [] in a bonding room or interview room where the attorney is physically present in the facility.   This type of visit is an in-person visit and is scheduled through booking.   A deputy is not present during these visits.   The room is not recorded." *Id.*, pp. 1-2.   Further,

> [t]he second way an attorney can meet with an inmate is via a ZOOM meeting.   These also occur in a bonding room where the attorney provides a personal meeting id (PMI) for the detainee to log into an iPad.   This keeps the detainee from accessing content that is not allowed.   These meetings are also scheduled through booking.   A deputy is not present during these visits but can see into the room to check on the detainee.   Neither the bonding room nor the zoom meeting are required by Washington County Jail officials.

*Id.*, p. 2.

Plaintiff disputes there were opportunities outside of the November 19, 2021, and December 14, 2021, attorney/detainee meetings to meet privately with his counsel.   (ECF No. 104, p. 14).   Plaintiff claims he repeatedly requested a private meeting with counsel, but WCDC officials refused those requests and that he was not allowed to meet privately with counsel until the state trial court judge ordered such a meeting.   *Id.*

It is undisputed, however, that an inmate's *counsel* must initiate the request for a private meeting, and importantly, Plaintiff does not claim that WCDC officials refused *his counsel's requests* to meet with him privately – either in person or via zoom.   Indeed, the record reflects that Plaintiff was represented by court appointed counsel from November 19, 2021, to December 15, 2021, private counsel from February 10, 2022, to February 18, 2022, and again by court appointed counsel as of March 3, 2022, and no facts in the record suggest that during these periods,

28

WCDC jail officials denied Plaintiff's counsel's request for private meeting.[15]

Further, the record shows – and Plaintiff does not dispute – that WCDC officials repeatedly instructed Plaintiff to contact the public defender's office directly for the paperwork to request representation from that office.   *See* (ECF No. 70-3, pp. 3, 4).   The record illustrates that WCDC officials provided Plaintiff with the mailing address and phone number of the public defender's office.   *Id.*   It is undisputed that as of January 2, 2022, a request had been sent "to the Public Defender's office to talk to [Plaintiff]."   *Id.* at p. 8.   There is no evidence in the record – disputed or otherwise – to suggest that WCDC impeded Plaintiff's ability to contact the Public Defender's Office or private counsel by phone.[16]   No material fact in dispute suggests that WCDC prevented Plaintiff from communicating with appointed or private counsel through the mail.[17]   Because it is

---

[15] Plaintiff, it seems, contends that counsel do not request private meetings with their detainee-clients because those meetings are inconvenient for them.   *See* (ECF No. 104, p. 7).   Plaintiff's argument, however, does not detract from the point that private meetings are available at the attorney's request.

[16] The Washington County Detention Center Handbook advises that "[a]ll [telephone] calls may be recorded for security and Law Enforcement purposes."   (ECF No. 70-7, p. 1).   Thus, while an inmate may be justified in refusing to discuss the substance of his criminal case with his attorney over the phone, this same concern does not apply when an inmate calls his attorney to simply request that the attorney arrange for a private attorney/client meeting at the WCDC.

[17] In support of their Motion for Summary Judgment, Defendants submitted body camera video dated December 15, 2022, showing two sheriff's deputies confronting Plaintiff about the content of his mail.   (ECF No. 70-5).   In that video, sheriff's deputies inform Plaintiff of their concern that the envelope contains "contraband" because they feel a "hard object," Plaintiff repeatedly asserts that the mail only contains a "letter to [his] lawyer."   *Id.*   Ultimately, the sheriff's deputies open the envelope in Plaintiff's presence, see that the envelope contains a card and a piece of paper that has been folded many times so that it "feels" like a hard object (and potentially contraband), and then tells Plaintiff that the envelope will be put in the mail, without unfolding the paper.   *Id.*   Plaintiff contends that the video shows sheriff's deputies "refusing to send [his] legal mail and opening [his] legal mail." (ECF No. 104, p. 13). The body cam video, however, blatantly contracts Plaintiff's assertions.   This, Court, therefore, declines to adopt them.   *See Scott v. Harris*, 550 U.S. 372, 380 (2007).   In any event, it is well settled that officials may inspect attorney mail for contraband in the presence of the inmate without offending the Constitution.   *See, e.g.*, *Moore v. Rowley*, 126 F. App'x 759, 760 (8th Cir. 2005).   Accordingly, the Court considers it undisputed

29

undisputed that there are other ways for detainees to communicate with their attorneys, this Court finds that the second *Turner* factor weighs in favor of Washington County.

With respect to the third *Turner* factor, the Court considers the effect "accommodation of the right would have on guards and inmates and prison resources." *Overton*, 539 U.S. at 135.   As the Court understands it, Plaintiff's proposed accommodation would be as follows: whenever he requests to meet with his attorney, the WCDC accommodates that request.   As the Court sees it, this proposal would shift the onus onto WCDC officials to both identify a detainee's attorney and coordinate scheduling.   There exists no constitutional imperative requiring WCDC officials to determine whether a detainee is represented by court appointed or private counsel and then to track down and coordinate a meeting between counsel and the detainee.   Put differently, WCDC officials do not serve as the detainees' personal administrative assistants.   To the extent a detainee is represented by court-appointed counsel, the summary judgment record reflects that the WCDC "kiosk system" allows the detainee to directly contact the public defender's office.   *See, e.g.*, (ECF No. 70-7, p. 1).   This access likely facilitates a detainees' request to their court-appointed counsel to arrange a private meeting at the WCDC.   The Constitution simply does not require the WCDC to assume the responsibility for arranging meetings where an attorney does not request a private meeting with his client.[18]

Plaintiff seeks to change how attorney/detainee meetings take place immediately prior to court appearances, such as those conducted on November 19, 2021, and December 14, 2021.

---

for the purposes of this case on summary judgment that WCDC did not impermissibly interfere with Plaintiff's legal mail.
[18] Indeed, Rule 1.4 of the Arkansas Rules of Professional Conduct requires *attorneys* to maintain reasonable communication with their clients. *See* Ark. R. Prof. Conduct 1.4.

Plaintiff appears to propose an arrangement by which a detainee meet individually with the public defender representative virtually and outside the presence of others, suggesting such a meeting could take place in a "bonding room" like one of the ways attorneys and detainees can meet as described by Sgt. Sears.   *See* (ECF No. 70-8, p. 2).

The undersigned points out, however, that the record supports there are often multiple detainees scheduled for court at the same time, and WCDC is trying to accommodate a way for all of them to speak with the public defender representative at approximately the same time.   *See* (ECF No. 70-5).   It cannot be ignored that the events giving rise to Plaintiff's claims occurred during the COVID-19 pandemic, during which time "attempts were made [by WCDC] to limit movement of detainees and personnel in and out of the . . . Detention Center [to] attempt to limit the spread of the virus."   (ECF No. 70-9, p. 1).   While Plaintiff disputes the sincerity of the WCDC's efforts to combat the spread of COVID-19, (ECF No. 104, p. 8), he offers no facts to dispute WCDC's position that bringing a group of detainees scheduled for court on the same day into one room to be supervised by the same WCDC sheriff's deputies better serves the WCDC's interests in reducing the spread of COVID-19 and ensuring the safety and security of detainees and staff than, for example, individually escorting detainees to meet with the public defender representative and then escorting the detainees to a separate location for the court hearing.

Finally, the undersigned considers "whether the presence of ready alternatives undermines the reasonableness of the regulations." *Overton*, 539 U.S. at 136.   With respect to this factor, the question is "whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal." *Id.*   As noted above, although Plaintiff does not expressly propose an

alternative, the Court understands he proposes a that detainees meet with their court appointed attorney immediately before a hearing but outside the presence of others.   Considering such a proposal would likely require additional movement and the support of additional officers, the Court cannot say Plaintiff's proposal would have only a limited impact on the WCDC's legitimate penological goals of keeping the WCDC safe and secure. The undersigned notes this was particularly true during the onset of the COVID 19 pandemic, when Plaintiff's claims arose. Accordingly, even if Plaintiff possess standing to assert a First Amendment claim (which the Court believes he has not), the undisputed facts nevertheless fail to establish a First Amendment violation.

### *The Fifth Amendment*

Plaintiff contends these attorney/detainee meetings violate his rights under the Fifth Amendment. (ECF No. 28). "The Fifth Amendment, made applicable to the States by the Fourteenth Amendment, requires that 'no person . . . shall be compelled *in any criminal case* to be a witness against himself.'" *Chavez v. Martinez*, 538 U.S. 760, 766 (2003) (quoting U.S. Const. amend. V) (emphasis in the original).   "Statements compelled by police interrogations of course may not be used against a defendant at trial, but it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs."   *Id.* (cleaned up).   "The privilege against self-incrimination guaranteed by the Fifth Amendment is a *fundamental trial right* of criminal defendants.   Although conduct by law enforcement officials prior to trial may ultimately impair that right, a *constitutional violation occurs only at trial*." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990) (emphasis added).

Here, there are no facts – disputed or otherwise – suggestive that any of Plaintiff's

statements to the public defender representative on November 19, 2021, or December 14, 2021, or any statements made between December 15, 2021, and April 15, 2022 (when he met with appointed counsel), were used against him *at trial*.   Indeed, Plaintiff's state trial court record shows that he pleaded guilty and waived his right to trial. *See* Plea Questionnaire, *Scharnhorst*, Case No. 72CR-21-1768 (Wash. Cir. Ct. Jan. 17, 2023).   Thus, the facts do not establish a Fifth Amendment violation.

### The Sixth Amendment

Plaintiff contends WCDC violated his Sixth Amendment right to counsel.   *See* (ECF No. 28).   The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."   *Cronin v. Peterson*, 288 F.Supp.3d 970, 994-95 (D. Neb. 2018).   The right of the accused to assistance of counsel "is limited by its terms: it does not attach until a prosecution is commenced."   *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 198 (2008) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)).   "[A] criminal defendant's initial appearance before a judicial officer, where he learns of the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel."   *Rothgery*, 554 U.S. at 213.

Here, the state trial court record shows that Plaintiff's adversarial criminal proceedings started on November 19, 2021, when he appeared before a state court judge, learned of the charges against him, and was informed of his rights and the terms of his release.   (ECF No. 70-13).   Thus, Plaintiff's Sixth Amendment right to counsel *had not* attached during the detainee/attorney meeting immediately *prior to* this hearing.   Plaintiff's Sixth Amendment right to counsel was not violated on November 19, 2021, because it had not yet attached.

There is no question, however, that the Sixth Amendment's right to counsel applied to the December 14, 2021, detainee/attorney meeting.[19]   The question, then, is whether the Defendants violated that right at the December 14, 2021, meeting or at any time from December 15, 2021, until his meeting with counsel on April 15, 2021.   The undersigned finds they did not.

The Sixth Amendment "secures for the accused the right to have the assistance of counsel in his defense.   The accused does not enjoy the effective aid of counsel if he is denied the right of private consultation with him."   *Mastrian v. McManus*, 554 F.2d 813, 821 (8th Cir. 1977) (internal citation omitted).   But "[e]vidence that a party monitored the accused's conversations with his attorney does not necessarily establish a Sixth Amendment violation."   *Id.*   Rather, to establish a Sixth Amendment violation, "a criminal defendant must show two things: first, that the government knowingly intruded into the attorney-client relationship; and second, that the intrusion demonstrably prejudiced the defendant, or created a substantial threat of prejudice."   *United States v. Hari*, 67 F.4th 903, 912 (8th Cir. 2023) (quoting *United States v. Singer*, 785 F.2d 228, 234 (8th Cir. 1986)).

With respect to the December 14, 2021, detainee/attorney meeting, it is undisputed that WCDC officials and other inmates were present during Plaintiff's meeting.   It is also undisputed that WCDC officials would not leave the room or allow Plaintiff to leave the room alone with the iPad to meet with the public defender representative privately *at that time*.   Assuming, without

---

[19] Plaintiff's Motion for Subpoena, (ECF No. 100), requests a subpoena of a transcript of the December 15, 2021, court hearing—a transcript that purportedly does not exist.   Plaintiff contends that the transcript "can help shed light on the facts of this case." *Id.*   But this Court cannot see how.   As noted above, Plaintiff's Sixth Amendment right to counsel had attached at the November 19, 2021, court hearing, meaning it applied from that date until the termination of his criminal proceedings.   The relevant question, therefore, is whether the undisputed facts establish a violation of that right—a question this Court answers in the negative.

deciding, that the presence of WCDC officials during the December 14, 2021, detainee/attorney meeting constitutes a "knowing intrusion" into the attorney/client relationship, to establish a Sixth Amendment violation, Plaintiff must then show that the intrusion either prejudiced him or created a substantial threat of prejudice.

Here, the undisputed record undermines the Sixth Amendment claim as Plaintiff refused to discuss *any* matters with the public defender representative on December 14th. (ECF No. 28, p. 11); (ECF No. 70-9, p. 3). Because he said nothing, nothing he said could have prejudiced him in his criminal proceedings.[20] For his part, Plaintiff asserts that he suffered injury because "[t]he acts by [WCDC sheriff's deputies] Bell, Sharp, and Edens, refusing me a private meeting with [his] attorney on December 14 was the direct cause of [him] being denied public defender representation." (ECF No. 104, p. 3). While perhaps logical to Plaintiff, this argument is contrary to law. As discussed above, Rule 8.2 of the Arkansas Rules of Criminal Procedure governs the appointment of counsel, requiring "[a] *judicial officer* [to] determine whether the defendant is indigent and, if so, appoint counsel to represent him or her at the first appearance, unless the defendant knowingly and intelligently waives the appointment of counsel." Ark. R.

---

[20] Plaintiff asserts that he witnessed sheriff's deputies during these meetings assisting detainees in filing out their legal paperwork—or even completing their legal paperwork on the detainee's behalf. (ECF No. 104, p. 3). To the extent that Plaintiff claims that his experience is evidence of the WCDC's custom or policy of requiring WCDC officials to be present during these attorney/detainee meetings, this practice is not disputed. *See, e.g.*, (ECF No. 70-9); (ECF No. 70-3, p. 2). Moreover, as explained above, the practice does not, by itself, constitute a constitutional violation. To the extent that Plaintiff contends that these specific actions by this sheriff's deputy constitutes a violation of some other detainee's constitutional rights, Plaintiff cannot bring a constitutional claim under 42 U.S.C. § 1983 on behalf of someone else. *See Hodak v. City of St. Peters*, 535 F.3d 899, 904 (8th Cir. 2008) ("As a general rule, a plaintiff may only assert his own injury in fact and cannot rest his claim to relief on the legal rights or interests of third parties.") (internal quotation omitted).

Crim. P. 8.2(a) (emphasis added).   Plaintiff notes that "[the state trial court judge] refused [his] request to be represented by the public defender."   (ECF No. 28, p. 12).   During the period Plaintiff was not represented by appointed counsel, it was because the state trial court judge did not appoint one.   To the extent Plaintiff takes issue with the state court, this is not properly before the Court.[21]   Furthermore, Plaintiff asserts no facts suggesting that the state court's *delay* in appointment of counsel negatively impacted or prejudiced his state criminal case.

Absent such facts, Plaintiff has failed to establish injury.   Accordingly, Plaintiff's Sixth Amendment claims fail as a matter of law.   *See Stewart v. Wagner*, 836 F.3d 978, 987 (8th Cir. 2016) ("There is no constitutional tort without injury.") (quoting *Buckley v. Fitzsimmons*, 20 F.3d 789, 796 (7th Cir. 1994)).

### *Access-to-the Courts*

Plaintiff contends Defendants impermissibly interfered with his constitutionally protected right of "access-to-the-courts." *See* (ECF No. 28).   Although the specific constitutional provision that gives rise to "access to the courts claims" is unsettled, "it is well-established that an inmate has a constitutional right to meaningful access to the courts." *Laughlin v. Stuart*, Case No. 19-CV-2022 (ECT/TNL), 2022 WL 666738 at *13 (D. Minn. Jan. 21, 2022) (quoting *Berdella v. Delo*, 972 F.2d 204, 209 (8th Cir. 1992), *report and recommendation adopted by* 2022 WL 658701, *affirmed as mod.* 2022 WL 12165755 (8th Cir. Oct. 21, 2022) (per curiam).   "To prove a violation of the right to meaningful access to the courts, a prisoner must establish that the [defendant] has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of

---

[21] Absent two, limited exceptions, moreover, judicial officers are generally immune from suit. *See Justice Network Inc. v. Craighead Cnty.,* 931 F.3d 753, 759 (8th Cir. 2019) (quoting *Mireles v. Waco*, 502 U.S. 9, 11 (1991) (per curiam)).

confinement in a court of law, which resulted in actual injury, that is, the hinderance of a nonfrivolous and arguably meritorious legal claim." *Hartsfield v. Nichols*, 511 F.3d 826, 831 (8th Cir. 2008).

The analysis here is similar as Plaintiff has failed to establish any injury or prejudice to his criminal case arising from the way WCDC officials conducted the November 19, 2021, and December 14, 2021, attorney/detainee meetings or from WCDC's policy requiring counsel to initiate requests for private attorney/detainee meetings. Although Plaintiff claims that WCDC officials' refusal to allow him to meet privately with counsel on December 14, 2021, resulted in a lengthy delay in the appointment of counsel, this argument continues to ignore the fact that a *judicial officer*, and not WCDC officials, determine whether (and when) counsel should be appointed. *See* Ark. Crim. P. 8.2(a). Accordingly, Plaintiff's "access-to-the-courts" claim against WCDC similarly fails.

### Fourteenth Amendment

This leaves Plaintiff's Fourteenth Amendment claims. Plaintiff first asserts that the November 19, 2021, and December 14, 2021, attorney/detainee meetings and the refusal of WCDC officials to arrange a private meeting with counsel on his behalf violate his Fourteenth Amendment rights. (ECF No. 28). Second, Plaintiff claims that the WCDC's failure to allow him to meet privately without counsel ahead of his December 15, 2021, arraignment denied him due process because at his arraignment, the state trial court judge relieved the public defender's office of representation, causing him to proceed without counsel until April 15, 2022. *Id.*

Taking these two claims in turn, the United States Court of Appeals for the Eighth Circuit has said that "[p]re-trial detainees have a substantial due process interest in effective

communication with their counsel and in access to legal materials." *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989). "Detainees' right to counsel and due process can [] be compromised by a lack of privacy in consultations with counsel." *Id.*

In *Johnson-El*, the pretrial detainee-plaintiffs only had "one chance every two weeks to call their attorney's office. Furthermore, when [they] attempted to telephone [their] attorney during the day and the line was busy or [their] attorney was away from [his] office, [their] allotted phone call was considered made and [he] had to wait another two weeks for another attempt." *Id.* at 1051. When inmates reached their attorneys or their attorneys came to the jail for an attorney meeting, moreover, there was no opportunity for a private meeting or phone call. *Id.*

The undisputed facts here are distinguishable from *Johnson-El*. While it is undisputed that there was no opportunity for a private attorney/detainee meeting on November 19, 2021, or December 14, 2021, the WCDC allows for attorneys to contact the WCDC to arrange for private attorney/client meetings. There are no facts in the record to suggest that WCDC's policies – like the ones at issue in *Johnson-El* – unreasonably inhibited Plaintiff from contacting attorneys to inquire about representation (when he was unrepresented) or from contacting his private or appointed counsel (when he was represented) to request that they arrange for a private meeting on his behalf. Accordingly, the undisputed facts do not establish a violation of Plaintiff's right to access to counsel under the Fourteenth Amendment.

Finally, with respect to Plaintiff's due process argument, Plaintiff claims that he was deprived of "liberty without due process of law." (ECF No. 28, p. 5). This claim does not square with the undisputed facts in the summary judgment record. Plaintiff was booked into the WCDC on November 18, 2021, and appeared before the state court judge on the following day, November

19, 2021.  *See County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) (holding that a jurisdiction that provides a probable cause determination within 48 hours of arrest generally does not offend the Fourth Amendment).   To the extent that Plaintiff contends that the delay from his first appearance on November 19, 2021, to his arraignment on December 15, 2021, violated his procedural due process rights, there is no evidence that any of the Defendants herein rescheduled Plaintiff's court hearing.   To the extent that Plaintiff contends that his procedural due process rights were violated because the state court judge relieved the public defender's office of representing him on December 15, 2021, none of Defendants made the decision.   Accordingly, the facts do not establish a Fourteenth Amendment due process violation.

 **b.**  **Claims**

 The November 19, 2021, and December 14, 2021, attorney/detainee meetings, therefore, do not, by themselves, offend the constitution.   Similarly, WCDC's undisputed practice of requiring attorneys to initiate private attorney/detainee meetings at the WCDC survives constitutional scrutiny.   Thus, with respect to Plaintiff's individual claims, it is undisputed that there were no constitutional violations, and Defendants are therefore entitled to qualified immunity.

### *Claim 1: Conspiracy*

 Plaintiff claims that on November 19, 2021, December 14, 2021, and from December 15, 2021, to April 15, 2022, Defendants Helder, Denzer, Mulvaney, and Yates "conspired, knowingly and intentionally, to deprive detainees of their constitutionally protected rights by implementing a widespread daily practice of forcing detainees to meet with public defenders, discussing their rights, personal information, activities, accomplices, etc. in the presence of sheriff's deputies and

other detainees." [22]   (ECF No. 28, pp. 5-6).   Plaintiff asserts violations of his First, Fifth, Sixth, and Fourteenth Amendment rights to attorney/client privilege, access to the courts, right to legal counsel, and violations of his right to due process of law.   *Id.*

As a threshold matter, "[s]uits against officials in their individual capacity seek to impose personal liability upon a government official for actions he takes under color of state law."   *Handt v. Lynch*, 681 F.3d 939, 943 (8th Cir. 2012) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)).   To establish liability against officials in their individual capacity, "the plaintiff must show that the official, acting under color of state law caused the deprivation of a federal right."   *Id.* at 943 (citing *Graham*, 473 U.S. at 166) (emphasis added); *see also Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006) ("Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.").   Put another way, it is not enough for a plaintiff seeking relief from a defendant in the defendant's individual capacity to allege that his rights were violated; the plaintiff must instead allege that his rights were violated *by the defendant*.

Plaintiff fails to allege any facts suggesting that any of the remaining defendants – Helder, Denzer, Mulvaney, and Yates – were *personally* involved in denying him private access to counsel on November 19, 2021, December 14, 2021, or between December 15, 2021, to April 15, 2022. (ECF No. 28).   Plaintiff endeavors to circumvent this failure of proof by alleging these Defendants

---

[22] Although Plaintiff identifies John Doe Public Defender and John Doe Sheriff Deputies as defendants to this claim, the claims against the John Doe Public Defender defendants were previously stricken.   *See* (ECF Nos. 16, 34). Further, Defendant Bell was previously identified as a John Doe Sheriff Deputy, but for the reasons described above, claims against Defendant Bell should be dismissed without prejudice for failure to first exhaust administrative remedies pursuant to 42 U.S.C. § 1997e(a).   All remaining unidentified John Doe Sheriff's Deputies were previously terminated as defendants after Plaintiff failed to identify them by name within the timeframe provided by the Court, *see* (ECF No. 105), leaving Defendants Helder, Denzer, Mulvaney, and Yates as the only remaining defendants to this claim.

conspired to deprive him of his constitutional rights.  *Id.*   To state a claim of civil conspiracy pursuant to § 1983, "a plaintiff must allege that (1) defendants conspired to deprive the plaintiff of her constitutional rights; (2) at least one of the alleged co-conspirators engaged in an act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." *Tirado v. City of Minneapolis*, 521 F.Supp.3d 833, 844 (D. Minn. 2021) (citing *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008)).

The undersigned first questions whether Defendants Helder, Denzer, Mulvaney, and Yates – agents of the same governmental entity purportedly acting within the scope of their employment – could conspire together.  *See Faulk v. City of St. Louis, Mo.*, 30 F.4th 739, 750 (8th Cir. 2022) (determining that defendants were entitled to qualified immunity because the law was unsettled on whether agents of the same entity and working within the scope of their employment could engage in a civil conspiracy to violate someone's constitutional rights pursuant to 42 U.S.C. § 1983). Ultimately, however, this Court need not address this question because "[t]he threshold requirement for a § 1983 conspiracy claim is a deprivation of a constitutional right or privilege . . .." *Tirado*, 521 F.Supp.3d at 844 (citing *White*, 519 F.3d at 814).   For the reasons described above, Plaintiff has failed to establish a violation of his constitutional rights under the Fist, Fifth, Sixth, and Fourteenth Amendments.   Accordingly, Plaintiff's conspiracy claim fails as a matter of law, and the conspiracy claims against Defendants Helder, Denzer, and Mulvaney should be dismissed with prejudice.[23]

---

[23] Even if the John Doe Sheriff's Deputies had not been terminated from this action, the claims against them should nevertheless be dismissed with prejudice for the same reasons—for the reasons described above, the undisputed facts in the record show that the November 19, 2021, and December 14, 2021, attorney/detainee meetings, and WCDC's practice of requiring attorneys to arrange private attorney/client meetings on their clients behalf do not violate Plaintiff's First, Fifth,

*Claim 2: November 19, 2021*

Turning to claim 2, Plaintiff says that on November 19, 2021, John Doe Deputy #1 and John Doe Deputy #2 ordered him (along with fifteen other inmates) to conduct an attorney/client meeting in the presence of others in violation of his constitutional rights.   (ECF No. 28).

Because the Amended Complaint identified five John Doe Deputies as Defendants to this action, on November 14, 2022, this Court directed Defendant Helder to "advise the Court of (1) the names of the sheriff's deputies – John Doe Sheriff's Deputy #1 and John Doe Sheriff's Deputy #2 – who allegedly ordered Plaintiff to meet the public defender in the presence of others on November 19, 2021, and (2) the names of the sheriff's deputies – John Doe Sheriff's Deputy #3, John Doe Sheriff's Deputy #4, and John Doe Sheriff's Deputy #5 – who allegedly ordered Plaintiff to meet the public defender in the presence of others on December 14, 2021."   (ECF No. 34). After some back-and-forth between the parties and on March 15, 2023, Plaintiff filed a Notice saying that "Plaintiff identifies Deputy Richard Bell as the Deputy who insisted that [he] conduct a meeting with the public defender in his presence, the presence of others, and the presence of fellow detainees, in a room monitored by closed circuit camera and listening devices, and refused to allow me to meet with the public defender in private when [he] attempted to assert [his] rights by requesting privacy."   (ECF No. 54).

Plaintiff's Notice does not specify whether Defendant Bell was involved in the November 19, 2021, detainee/attorney meetings or the December 14, 2021, detainee/attorney meetings.   *Id.* Plaintiff identified no other John Doe Deputy defendant.   *Id.*   To the extent that Plaintiff intended for Defendant Bell to be identified as one of the John Doe Deputies who purportedly refused to

---

Sixth, or Fourteenth Amendment rights.

allow him to meet privately with counsel on November 19, 2021, as previously discussed, Plaintiff's claims against Defendant Bell should be dismissed without prejudice for failing to exhaust his administrative remedies before initiating this action in accordance with 42 U.S.C. § 1997e(a).   Because Plaintiff failed to identify the remaining John Doe Deputy Defendants within the timeframe provided by the Court, the remaining (unidentified) John Doe Deputy Defendants were then terminated from this action.   (ECF No. 105).

Even had Plaintiff cleared the procedural hurdles, his claims against the John Doe Deputies relating to the November 19, 2021, attorney/detainee meeting should be dismissed because, for the reasons described above, that meeting did not violate Plaintiff's First, Fifth, Sixth, or Fourteenth Amendment rights.   Plaintiff seeks to hold John Doe Deputy defendants responsible in their individual capacities for refusing to allow him to speak privately to the public defender representative on November 19, 2021.   (ECF No. 28, p. 7).   There are no facts in the record to suggest that any John Doe Deputy Defendants took (or failed to take) some other action—with respect to him or his criminal case – beyond facilitating and being present during his attorney/detainee meeting.

Moreover, as noted, the meeting itself did not violate Plaintiff's First, Fifth, Sixth, or Fourteenth Amendment rights.   Viewing the facts in the light most favorable to Plaintiff, the fact that one or more John Doe deputy defendants refused his request for a private meeting with the public defender representative does not change this analysis as Plaintiff failed to articulate any concrete injury that would trigger standing to assert a First Amendment violation; there are no facts suggesting statements he made during the November 2021 meeting were used against him in his criminal case in violation of his Fifth Amendment rights; and even if the right to counsel had

attached under the Sixth Amendment, no facts to suggest that the interference with his right to counsel injured his criminal case.   Similarly, there is no basis to conclude he was deprived of his constitutional right to access-to-the-courts because he has not articulated any injury to his criminal case.   Accordingly, Plaintiff's claims against the John Doe deputies from November 19, 2021, should be dismissed with prejudice.

### Claim 4: December 14, 2021

With respect to his fourth claim, Plaintiff asserts that on December 14, 2021, "he was ordered into a zoom meeting with the public defender by the deputies in their presence and the presence of other detainees." (ECF No. 28, p. 11). Plaintiff says that when it was his turn, he "refused to discuss anything except [his] objection to the situation and [his] reasons." *Id.*

Plaintiff's Amended Complaint identifies the sheriff's deputies as John Doe defendants. *Id.*   As previously noted, after months of back-and-forth, Plaintiff identified only Defendant Bell as one of the John Doe Deputy Defendants but failed to first exhaust administrative remedies as required pursuant to 42 U.S.C. § 1997e(a).   Although the remaining John Doe Deputy defendants were later terminated because Plaintiff failed to name them within the provided timeframe, Plaintiff's claims against these John Doe defendants must also be dismissed with prejudice.[24]   The undersigned finds that WCDC's pandemic practice of bringing several inmates into the same room and supervising as each detainee meets with the public defender representative virtually did not violate Plaintiff's constitutionally protected rights because there were other available methods for conducting detainee/attorney meetings/communications.

---

[24] Plaintiff's Motion to Supplement the Complaint seeks to add Justin Edens and Scott Sharp as defendants to this action for purportedly refusing to allow him to meet privately with counsel on December 14, 2021. *See* (ECF No. 98).

Plaintiff contends that on December 14, 2021, "deputies became adamant and even aggressive, insisting that [he] cooperate.   They conferred with the lady from the public defender's office and then she too became adamant that [he] cooperate and conduct [his] meeting with her in the presence of the deputies and other detainees." (ECF No. 28, p. 11).   Plaintiff offers no additional factual description of what the John Doe Deputies did (or did not do) that was "aggressive."

Defendant Bell says:

> The only time [he] spoke to [Plaintiff] was when he was present for the public defender's office to go over an Affidavit of Indigency and Arraignment Proceedings Form. No physical force was used.   [He] asked [Plaintiff] to tell the law clerk himself that he did not want to speak with them so that they did not think that I was speaking for him.

(ECF No. 70-9, p. 3).

It is undisputed that none of the Deputies used physical force during the December 2021 meeting.   *See* (ECF No. 104).   Plaintiff similarly fails to allege that any of the Deputies displayed any *show* of force.   Plaintiff's bare, non-particularized allegation that the John Doe Deputies became "aggressive" towards him during the December 14, 2021, attorney/detainee meeting because he was not "cooperating" is simply insufficient to establish a constitutional claim as a matter of law.   *See Barfield-Peak v. Rudolph*, Case No. 8:24-CV-59, 2024 WL 837135, at *2 (D. Neb. Feb. 28, 2024) ("[B]eing rude and unhelpful . . . does not amount to a constitutional violation.") (listing cases); *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1984) (name calling and verbal threats are not constitutional violations cognizable under § 1983).   With respect to Plaintiff's fourth claim, the John Doe Deputies are thus entitled to qualified immunity and this claim should be dismissed with prejudice, as well.

*Claim 6: Defendant Mulvaney*

Plaintiff's sixth claim alleges that from December 15, 2021, to April 15, 2022, Defendant Mulvaney denied Plaintiff's multiple requests for a private meeting with counsel.   (ECF No. 28). Defendants respond that Defendant Mulvaney cannot be liable under § 1983 for simply responding to grievances.   (ECF No. 69).   This Court agrees with the Defendants.

It is undisputed that Plaintiff repeatedly requested to meet privately with counsel.   For example, on December 15, 2021, Plaintiff submitted the following grievance:

> I demand to have the privacy to meet with legal counsel as prescribed by law.

(ECF No. 70-3, p. 1). Defendant Mulvaney responded that same day, saying, in pertinent part:

> We will not leave you alone to do this for the safety and security of the facility as long as we are doing proceeding like these.  If you [sic] attorney wishes to have a private meeting with you then we will accommodate him or her at that time, but not during these appearances here in this setting.

*Id.* at p. 2.

On December 20, 2021, Plaintiff submitted another grievance on the topic, saying:

> I've had sheriff deputies standing over my shoulder during both meetings I've had with the public defender and have been present during other detainees meetings and been apartied [sic] to information which violates the rights of privacy of those individuals and had the reverse situation whereas other detainees are now aware of details of my legal case which they should not be.

*Id.* at p. 5.   Defendant Mulvaney again responded on December 28, 2021:

> I have already explained once before that you will not be allowed to have private meetings, at least until your attorney requests it.

*Id.* at p. 6.   Defendant Mulvaney provided substantially the same response again on January 11, 2022.   *Id.* at p. 7.

46

It is well-established that Defendant Mulvaney is not liable under § 1983 simply for responding to (and denying) Plaintiff's grievances. *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) ("A prison grievance procedure is a procedural right only, it does not confer any substantive rights upon the inmates.   Hence, it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the fourteenth amendment.") (quoting *Azeez v. DeRobertis*, 568 F. Supp. 8, 10 (N.D. Ill. 1982)).

Plaintiff asserts, in pertinent part, that his "claim is that despite [his] grievances Mulvaney refused to take action in order to rectify the unlawful policies of the department." (ECF No. 104, p. 6).   There are several problems with this argument.   First, Defendant Mulvaney's purported failure to step in and allow Plaintiff to meet privately with counsel is simply another way of saying that Defendant Mulvaney denied Plaintiff's kiosk submissions requesting a private meeting with counsel.   *See Lomholt v. Holder*, 287 F.3d 683, 684 (8th Cir. 2002) ("[D]efendants' denial of [plaintiff's] grievances did not state a substantive constitutional claim.") (citing *Buckley*, 997 F.2d at 495).   Second, and more to the point, to the extent that Plaintiff's kiosk submissions are referring to the November 19, 2021, and December 14, 2021, detainee/attorney meetings, as described in detail below, the way the WCDC conducted those meetings does not, by itself, violate Plaintiff's constitutional rights. Third, and to the extent that Plaintiff's kiosk submissions are referring to some other proposed detainee/attorney meeting, as explained above, the WCDC's practice of requiring attorneys to initiate the scheduling of in-person (or virtual) attorney/detainee meetings is not unconstitutional.   Thus, Defendant Mulvaney is entitled to qualified immunity and the claims against him in his individual capacity should be dismissed with prejudice.

### c.      Official Capacity

This leaves Plaintiff's official capacity claims. "Official-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by the government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Gladden v. Richbourg*, 759 F.3d 960, 968 (8th Cir. 2014) (quoting *Grayson v. Ross*, 454 F.3d 802, 810-11 (8th Cir. 2006)).   "Although there must be an unconstitutional act by a municipal employee before a municipality can be held liable, there need not be a finding that a municipal employee is liable in his or her individual capacity." *Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018) (internal quotations and citations omitted).

Here, after a close and careful review of WCDC's practices with respect to the November 19, 2021, and December 14, 2021, attorney/detainee meetings, and WCDC's policies with respect to private attorney/client meetings, this Court finds no constitutional violation.   Plaintiff's official capacity claims should be dismissed with prejudice.

### OTHER MOTIONS

There are three additional motions pending before the Court: (1) Plaintiff's Motion to Supplement the Amended Complaint, (ECF No. 98); (2) Plaintiff's Motion for Subpoena, (ECF No. 100); and (3) Plaintiff's Motion to Supplement his Response to Defendants' Motion for Summary Judgment, (ECF No. 106).   Defendants have filed responses to all three motions.   *See* (ECF Nos. 99, 101, 107).   This Court addresses each motion, in turn, below.

### *Motion to Supplement the Amended Complaint*

On February 7, 2024, Plaintiff filed a Motion to Supplement the Amended Complaint to identify Deputies Scott Sharp and Justin Edens as two of the John Doe Deputies who were present

during the December 14, 2021, attorney/detainee meeting.   (ECF No. 98).   Defendants object to any such amendment as untimely. *See* (ECF No. 99).   This Court finds – based upon the analysis herein – that adding Sheriff's Deputies Scott Sharp and Justin Edens as defendants would be futile.

Pursuant to Rule 15 of the Federal Rules of Civil Procedure, "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d).   "A supplemental pleading . . . is designed to cover matters subsequently occurring but pertaining to the original cause."   *United States v. Vorachek*, 563 F.2d 884, 886 (8th Cir. 1977).   The decision whether to grant leave to supplement a pleading is within the sound discretion of the trial court.   *See Minnesota Mining & Manufacturing, Co. v. Superior Insulating Tape Co.*, 284 F.2d 478, 481 (8th Cir. 1960).

Plaintiff's Motion to Supplement does not seek to add matters that occurred *after* the filing of the Amended Complaint.   Rather, Plaintiff seeks to name the defendants he identified in his Amended Complaint as "John Does."   There are several problems with this request.

First, Plaintiff's opportunity to amend elapsed a long time ago.   After Plaintiff filed his Amended Complaint on November 14, 2022, the undersigned directed the named Defendants to assist Plaintiff in identifying the "John Doe Deputy" defendants.   (ECF No. 34).   Upon receipt of Defendants' response to that order, this Court directed Plaintiff to name the unidentified defendants by January 2, 2023.   (ECF No. 41).   On December 29, 2022, Plaintiff advised the Court that he had "positively identified Richard Bell as one of the Deputies present at [his] meeting with the public defender on December 14, 2021, … and he [had] positively *excluded* Tyler Ricker and Justin Edens, being familiar with these two deputies." (ECF No. 42) (emphasis added).

49

Plaintiff requested more time to further name the unidentified John Doe deputies.   *Id.*; (ECF No. 46).   Defendants did not object, and Plaintiff was granted an extension until March 20, 2023, to name the yet unidentified John Doe Deputy Defendants. (ECF No. 49).   On March 15, 2023, Plaintiff filed a notice with the Court identifying Defendant Richard Bell as one of the John Doe Deputy Defendants, failing to identify any other John Doe Deputy Defendant by name. (ECF No. 54).   The remaining John Doe Deputy Defendants were subsequently terminated.   (ECF No. 105).

Plaintiff's February 7, 2024, Motion to Supplement comes almost eleven months *after* the deadline for identifying the John Doe Deputy defendants.   Pursuant to Federal Rule of Civil Procedure 4(m), "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time . . .." Fed. R. Civ. P. 4(m).   Plaintiff's Motion is plainly untimely.

While Rule 4 provides that the Court must extend the period for service "if the plaintiff shows good cause for the failure" to serve, Plaintiff fails to articulate any good cause.   Plaintiff says Defendants previously named "Richard Bell, Scott Sharp, and Justin Edens," as Sheriff's Deputies who were present during his December 14, 2021, attorney/detainee meeting and that "by some apparent bad faith effort on the part of the Defendants, or an oversight by the Court, Scott Sharp and Justin Edens were not added to the case to replace their John Doe identifiers."   (ECF No. 98).   This argument is spurious – after Defendants identified the names of sheriff's deputies who may have been present during Plaintiff's November 19, 2021, and December 14, 2021, attorney/detainee meetings, (ECF No. 38), this Court *directed Plaintiff* to positively identify which

ones were implicated in his claims and then gave him additional time to do so.   *See* (ECF No. 41).

It was Plaintiff himself who *excluded* Justin Edens as one of those deputies. *See* (ECF Nos. 42,

46).   There is no good cause for Plaintiff's failure to identify Sheriff's Deputies Scott Sharp and

Justin Edens particularly where Plaintiff positively excluded Justin Edens as one of the John Doe

Deputy defendants more than one year ago.

And importantly, for the reasons set forth herein, this Court finds the WCDC

attorney/detainee meeting on December 14, 2021, did not violate Plaintiff's constitutionally

protected rights, and recommends Plaintiff's claim against the John Doe Deputy Defendants from

the December 14, 2021, meeting be dismissed with prejudice.   Ordering service on Sheriff

Deputies Scott Sharp and Justin Edens, therefore, would be futile.   Thus, Plaintiff's Motion to

Supplement the Amended Complaint (ECF No. 98) is **DENIED**.

### *Motion for Subpoena*

On February 23, 2024, Plaintiff filed a Motion for Subpoena for the transcript from his

December 15, 2021, state court hearing.   (ECF No. 100).   Defendants say they requested the

transcript but learned it does not exist.   (ECF No. 101).   Defendants do not object to this Court

issuing a subpoena for this transcript.   *Id.*

On March 17, 2023, this Court entered an initial scheduling order in accordance with Rule

16 of the Federal Rules of Civil Procedure.   (ECF No. 57).   That Order required the parties to

complete discovery by July 17, 2023.   *Id.*   Plaintiff did not request a subpoena from this Court

until February 2024, seven months after the discovery period ended. (ECF No. 100).   Plaintiff's

Motion is once again plainly untimely.

Recognizing that *pro se* filings are to be liberally construed, this Court views Plaintiff's

Motion for Subpoena as a request to reopen discovery to allow for this subpoena.   But the Court's scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4).   "The primary measure of good cause is the movant's diligence in attempting to meet the [scheduling] order's requirements . . .." *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 716 (8th Cir. 2008).   "While prejudice to the nonmovant resulting from modification of the scheduling order may also be a relevant factor, generally, [courts] will not consider prejudice if the movant has not been diligent in meeting the scheduling order's deadlines." *Id.* at 717 (citing *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001)).

Plaintiff offers no reason why he did not request this subpoena *during* the discovery phase of litigation.   Thus, there is no good cause to extend or modify the Court's scheduling order to re-open discovery and subpoena Plaintiff's transcript from his December 15, 2021, state court hearing.   This is particularly true where Defendants have advised there is no evidence such a transcript exists.   For these reasons, Plaintiff's Motion for Subpoena (ECF No. 100) is **DENIED**.

### *Motion to Supplement Plaintiff's Response to Defendants' Motion for Summary Judgment*

Plaintiff also filed a Motion to Supplement his Response to Defendants' Motion for Summary Judgment.   (ECF No. 106).   Specifically, Plaintiff requests to supplement his response with a grievance describing a virtual detainee/attorney meeting where "[Sheriff's] Deputy Carter fills out legal paperwork for [an inmate] during his forced meeting with the public defender in the presence of deputies and detainees, and then instructs Ross to sign it." *Id.* at p. 2.   Defendants object, arguing, among other things, that the proposed evidence is "neither probative, admissible, nor relevant in this case." (ECF No. 107).

As the Court understands it, Plaintiff contends that he saw an attorney/detainee meeting

being conducted in the presence of others where a specific sheriff's deputy – who is not named as a defendant to this action—filled out an inmate's legal paperwork and then directed the inmate to sign it.

To the extent that Plaintiff saw this meeting occur, such evidence is admissible as within Plaintiff's personal knowledge.  Further, this evidence is probative of the WCDC's practice of requiring WCDC personnel to be present during certain attorney/detainee meetings.  But this proposed evidence is also needlessly cumulative – it is undisputed that WCDC personnel are present during certain attorney/detainee meetings, and specifically, were present during Plaintiff's attorney/detainee meetings on November 19, 2021, and December 14, 2021.  For the reasons described herein, these meetings being conducted in this manner do not violate Plaintiff's constitutional rights.

To the extent that Plaintiff contends that the way in which this particularly described attorney/client meeting was conducted with respect to an inmate other than himself, Plaintiff has no standing to assert a claim on this inmate's behalf.  Accordingly, Plaintiff's Motion to Supplement his Response to Defendants' Motion for Summary Judgment, (ECF No. 106) is **DENIED** as relevant but needlessly cumulative.  *See* Fed. R. Evid. 403.

## **ORDER**

For these reasons, it is **HEREBY ORDERED THAT**:

1. Plaintiff's Motion to Supplement the Amended Complaint (ECF No. 98) is **DENIED**.

2. Plaintiff's Motion for Subpoena (ECF No. 100) is **DENIED**.

3. Plaintiff's Motion to Supplement his Response to Defendants' Motion for Summary Judgment (ECF No. 106) is **DENIED**.

## **RECOMMENDATION**

For the reasons described above, the undersigned recommends that Defendants' Motion for Summary Judgment (ECF No. 68) be **GRANTED** as follows**:**

1. Plaintiff's claims against Defendant Bell, should be **DISMISSED WITHOUT PREJUDICE**, for failure to first exhaust his administrative remedies pursuant to 42 U.S.C. § 1997e(a).

2. Plaintiff's claims against Defendants Tim Helder, Randall Denzer, Tom Mulvaney, and Defendant Yates for conspiracy to deprive Plaintiff of his constitutional rights pursuant to 42 U.S.C. § 1983 (claim 1) should be **DISMISSED WITH PREJUDICE**.

3. Plaintiff's claims pursuant to 42 U.S.C. § 1983 against the John Doe Deputies stemming from his November 19, 2021, attorney/detainee meeting (claim 2) should be **DISMISSED WITH PREJUDICE.**

4. Plaintiff's claims pursuant to 42 U.S.C. § 1983 against the John Doe Deputies stemming from his December 14, 2021 (claim 4) attorney/detainee meeting be **DISMISSED WITH PREJUDICE**.

5. Plaintiff's claims pursuant to 42 U.S.C. § 1983 against Defendant Tom Mulvaney (claim 6) be **DISMISSED WITH PREJUDICE**.

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**STATUS OF REFERRAL: No longer referred.**

**DATED** this 28th day of May 2024.

_Christy Comstock_
CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE